DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Angela Berry, appeals her convictions and sentences on one count of murder, a violation of R.C. 2903.02(B), a special felony; one count of endangering children, a violation of R.C. 2919. 22(B) and (E)(3), a felony of the second degree; and one count of endangering children, a violation of R.C. 2919. 22(B)(3) and (E)(3), a felony of the third degree[1]. The following facts are taken from the evidence offered at appellant's trial.
 {¶ 2} At approximately 1:47 a.m. on the morning of January 17, 2004, the Toledo Firefighter Emergency Medical Services ("EMS") received a 911 call from appellant, who told them that her three year old son, Hassani Berry, was not breathing. When the EMS personnel arrived at appellant's apartment four minutes after receiving the call, they found Hassani lying naked on the floor in the apartment hallway. He was not breathing and was "very cold to the touch." Appellant told a paramedic, Randy Roslin, that Hassani was in the bathtub "approximately two minutes ago." Roslin moved the child to the couch and noticed that there was feces on the floor where he had been lying. While ventilating Hassani until such time that he could be transported to the hospital by the life squad, Roslin listened to his lung sounds and did not hear any water in the child's lungs.
 {¶ 3} Captain David Fought, an emergency medical technician who responded to appellant's 911 call, also noticed feces near the front door after Roslin carried Hassani to the couch. He, too, noted that the child was extremely cold and saw that there was feces in the bathtub. When Fought asked appellant how long Hassani had been in the bathtub, she first said, "A couple minutes." When asked again by Fought, she changed that time period to five minutes and then to 20 minutes.
 {¶ 4} Upon arrival at the hospital, a team of medical personnel attempted to resuscitate Hassani. His body temperature at that time was 19.2 degrees Celsius or 66 degrees Fahrenheit. The night charge nurse in the emergency room spoke with appellant in order to gather some background information that might aid in the child's treatment. Appellant told the nurse that Hassani had no chronic health problems, was not taking any medication, had no allergies, and was not sick recently. Appellant also stated that her child "drowned in the bathtub" while she was out of the bathroom. The charge nurse, however, noted that when Hassani was brought to the emergency room his hair was not wet/damp, that there was no wrinkling of his skin which occurs when a person is immersed in water for a period of time, and that there was no water in his esophagus. Hassani was pronounced dead at 3:20 a.m. on January 17, 2004.
 {¶ 5} Because of the differences between appellant's version of what caused Hassani's death and the medical evidence, the Toledo Police Department launched an investigation into the circumstances surrounding the child's death. They suspected that Hassani was locked out on appellant's enclosed unheated porch for an extended period of time in subfreezing weather. Therefore, they checked the temperature on the porch, and one detective stood in appellant's porch and yelled while other officers stood in the porch below appellant's apartment. The shouts could not be heard.
 {¶ 6} Detective Elizabeth Kantura of the Toledo Police Department was the lead detective on this case. She was called upon to investigate the death of Hassani on the morning of January 17, 2004. When the detective arrived at the hospital, she learned from hospital personnel that Hassani's body was "very cold." Kantura then spoke with appellant who said that she found Hassani under the water face up in the bathtub, that she pulled him out and shook him, and that she laid him in the hallway. Because she had a difficult time in determining the layout of appellant's apartment, the detective asked appellant if they could go back to her home. Appellant consented to the request. Kantura was also not sure whether the cause of Hassani's death was accidental or intentional. Therefore, she had appellant sign a waiver for a search of the apartment.
 {¶ 7} Kantura then drove appellant directly to her apartment. When they arrived, Kantura also noticed the fecal matter in the bathtub and that the tub itself looked dry. The floor where appellant indicated that she laid Hassani was also dry, and there were no towels in either the bathroom or on the floor where the child was found. There was, however, feces on the rug.
 {¶ 8} After appellant walked Kantura through the apartment while discussing the sequence of events that allegedly led to Hassani's death, the detective decided that it might be better that any discussion involving appellant's boyfriend, Christopher Gonzales, Sr., take place at the Toledo Police Department. According to Kantura, any suspicions that she had concerning the cause of Hassani's death related to Gonzales — not to appellant. Kantura also felt that to continue their discussion in appellant's home would be too traumatic for her. Appellant agreed to accompany the detective to the police station. Kantura asked appellant, who is apparently diabetic, whether she wanted anything to eat, and appellant said, "No." She did, however, ask to take her insulin with her.
 {¶ 9} At the station, Detective Kantura first interviewed Christopher Gonzales and then released him. Before interviewing appellant[2], the detective asked her if she wanted anything to eat or whether she needed any medication for her diabetes. Kantura then proceeded to elicit some background information, e.g., the number of appellant's children, her relationship with her boyfriend, and Hassani's typical behavior. Appellant told the detective that the following sequence of events occurred on January 16 and 17, 2004.
 {¶ 10} Christopher's mother brought the family hamburgers at around 7:00 in the evening. After eating their dinner, the family, which included appellant, Christopher, Sr., Hassani, and Christopher, Jr., decided to take a nap. Christopher Sr. received a telephone call around eight or nine o'clock in the evening and left. Appellant called him a few hours[3] later and said that Hassani had vomited. Because she was approximately eight months pregnant, appellant could not bend over and asked Christopher, Sr. to come home and clean up the vomit. He came back to the apartment, cleaned up, found Hassani naked in the bathtub, turned on the shower, told appellant to "watch the water," and left again.
 {¶ 11} According to appellant, she turned off the shower and allowed her three year old son to remain in the bath by himself. She called Christopher, Sr. a couple of times over the next few hours. According to appellant, she was also on the telephone with friends but kept checking on Hassani about every ten minutes. The last time she called Christopher, Sr., appellant told him that she found Hassani floating face up in the bathtub. By the time that he arrived home, EMS was already there attempting to resuscitate the child.
 {¶ 12} Appellant was arrested and, subsequently, indicted by the Lucas County Grand Jury, on the charges set forth above. Appellant filed a motion in which she sought the suppression of any statements she made both before and after she was advised of her rights under Miranda v.Arizona (1966), 384 U.S. 436. In her motion, appellant did not point out any particular statements that she wanted suppressed. At the suppression hearing, however, the trial court asked her trial counsel to delineate the statements that were the subjects of appellant's motion. Counsel referred to the following statements: (1) that Hassani drowned; (2) whether he was face up or face down in the bathtub; (3) how long it took appellant to check on the Hassani; and (4) how often she checked on Hassani while he was in the bathtub. After the hearing, the trial court denied the motion to suppress.
 {¶ 13} At appellant's trial, Diane Scala-Barnett, M.D., a forensic pathologist who is a deputy coroner in the Lucas County Coroner's Office, testified on behalf of the prosecution. She examined Hassani's body on the morning of January 17, 2004. Dr. Scala-Barnett first looked for external and internal physiological signs, such as wet hair, wrinkling of the skin, and water in the sphenoid sinus, that would establish that Hassani drowned. The doctor testified that there were no signs that the child's death was caused by drowning. During her examination and testing of Hassani's body, Dr. Scala-Barnett found that in all other respects, Hassani was a physically healthy three year old child. Because a low body temperature, e.g., 66 degrees Fahrenheit[4], can, in and of itself, cause the death of a human being, she proceeded to look for any evidence that Hassani was exposed to a very cold environment. The doctor found no signs of frostbite on Hassani's body. She therefore concluded that he was not exposed to outside winter weather.
 {¶ 14} Dr. Scala-Barnett later went to appellant's apartment. She first looked in the bathtub, measured the height of the side of the tub, and, based upon Hassani's height, decided that, if he wanted to or was allowed to, he could have climbed out of the bathtub without the help of an adult. She looked inside the refrigerator to see if the child might have been placed in there and determined that he had not. The doctor then went out of the living room onto the enclosed porch and took the temperature; it was 26 degrees Fahrenheit. She also noticed that the door to the porch locked only from the inside. At trial and based upon her examination of Hassani's body, as well as her other observations, Dr. Scala-Barnett opined, to a reasonable degree of medical certainty, that Hassani died from hypothermia and that his death was a homicide.
 {¶ 15} After appellant was found guilty, the trial court ordered a presentence investigation report and set this case for sentencing. On January 27, 2005, the court ordered appellant to serve an indeterminate sentence of 15 years to life in prison for her conviction on one count of murder, in violation of R.C. 2903.02(B), a special felony. For the conviction on one count of endangering children, in violation of R.C.2919.22(B)(3) and (E), a felony of the second degree, the court ordered appellant to serve seven years in prison and for the conviction on one count of endangering children, in violation of R.C. 2919.22(B)(3) and (E), a felony of the third degree, the court ordered appellant to serve 3 years in prison. While he ordered that 3 year sentence was to be served concurrently with the sentences imposed for the murder and conviction for third degree child endangering, the court further ordered that the they be served consecutive to the conviction for second degree child endangering.
 {¶ 16} Appellant timely appeals and claims that the following errors occurred in the proceedings below:
 {¶ 17} "The trial court erred to the prejudice of Ms. Berry when it admitted speculative evidence beyond the expertise of the expert witness regarding the cause of death of Hassani where the probative value was outweighed by the prejudicial nature of the evidence.
 {¶ 18} "The trial court erred to the prejudice of Ms. Berry by denying the motion for acquittal presented by the defense at the conclusion of trial.
 {¶ 19} "A trial court erred to the prejudice of Ms. Berry by denying her motion to suppress statements to law enforcement officers [sic] violation of her due process rights guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.
 {¶ 20} "The trial court erred to the prejudice of Ms. Berry when it sentenced her to non-minimum, consecutive sentences based on facts not alleged in the indictment nor admitted by Ms. Berry.
 {¶ 21} "A trial court errs and a criminal defendant is denied due process of law under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution where it fails to determine if a criminal defendant's failure to testify is the result of his own decision.
 {¶ 22} "The trial court erred to the prejudice of Ms. Berry when it ordered her to pay unspecified costs, including court appointed fees, without first determining the ability to pay those costs."
 {¶ 23} Because it involves a pretrial constitutional issue, we shall first address appellant's third assignment of error. In that assignment of error, appellant contends that the trial court erred in denying her motion to suppress any statements that she made to Detective Kantura both prior to and after her arrest. Appellant maintains that the trial court erred in overruling her motion to suppress because it is clear from the facts of this case that appellant was in custody at all times during her interview with Detective Kantura. Specifically, appellant maintains that the constant police presence, the fact that she was driven by a police officer to and from the her residence, and was placed in a room at the police station and questioned for several hours would lead her to believe that she was not free to leave.
 {¶ 24} The applicable standard of review on a motion to suppress evidence presents a mixed question of law and fact to the reviewing court. State v. Long (1998), 127 Ohio App.3d 328, 331-332. The trial court, as the trier of fact resolves questions of fact and evaluates the credibility of witnesses. State v. DePew (1988), 38 Ohio St.3d 275, 277;State v. Hopfer (1996), 112 Ohio App.3d 521, 548. However, the trial court's legal conclusions are not afforded any deference, but are reviewed de novo. State v. Russell (1998), 127 Ohio App.3d 414, 416. (Citation omitted.)
 {¶ 25} The Fifth Amendment to the United States Constitution provides that an individual shall not "be compelled in any criminal case to be a witness against himself." The United States Supreme Court extended the protection of the Fifth Amendment right against self-incrimination to police interrogation of individuals in custody. Miranda v. Arizona
(1966), 384 U.S. 436. Miranda requires that before an individual in custody may be interrogated, police officers must advise her of her constitutional rights to remain silent, to obtain an attorney, or have an attorney appointed by the state if she is unable to afford one. Id. at 444.
 {¶ 26} A custodial interrogation occurs when questioning is initiated by law enforcement officers after a person is taken into custody or is otherwise deprived of her freedom of action in any significant way. Id. Thus, a defendant need not be under arrest to be considered in custody for Miranda purposes. State v. Farris, 109 Ohio St.3d 519,2006-Ohio-3255, ¶ 13. The test for determining if a defendant is in custody "is whether, under the totality of the circumstances, a `reasonable person would have believed that [s]he was not free to leave.'" State v. Gumm (1995), 73 Ohio St.3d 413, 429, quotingUnited States v. Mendenhall (1980), 446 U.S. 544, 554.
 {¶ 27} In the present case, it is clear that appellant was not in the "custody" of Detective Kantura during the early portion of the investigation of the circumstances leading to Hassani's death. The testimony at the suppression hearing revealed that the police officer actually thought that Christopher, Sr. might have caused the child's death. When asked whether appellant was free to leave, Kantura replied, "Yes." Kantura further testified that there was nothing to indicate that appellant had anything to do with Hassani's death at that time. Thus, there is no evidence in the record showing that appellant was deprived of her freedom in any significant way prior to the time that she was advised of her Miranda rights.
 {¶ 28} It was only after the Lucas County Coroner's office informed Kantura of the fact that there was no water in Hassani's lungs that the detective suspected that appellant might have caused the death of her child. At that point, the detective asked appellant her level of education and whether she had taken any drugs before explaining herMiranda rights. Appellant also orally read and signed a written waiver of those rights. A review of the videotape of the ensuing interrogation reveals that appellant appears to be an intelligent, articulate individual, who insisted that her child drowned in a bathtub of "cool" water. Although the interview was lengthy, five hours including the period before appellant was informed of her Miranda rights, there were at least two or three breaks taken. Appellant was also provided with bottled water and the opportunity to eat. Appellant never asked for an attorney throughout this proceeding nor requested that the questioning stop. For these reasons, appellant's third assignment of error is found not well-taken.
 {¶ 29} Appellant's first assignment of error challenges the expert testimony of Dr. Scala-Barnett with regard to the cause of Hassani's death. Appellant argues that the deputy coroner's conclusion that Hassani died from hypothermia because he was placed upon the enclosed, unheated porch is purely speculative and was highly prejudicial.
 {¶ 30} Any decision concerning the admission or exclusion of expert testimony will not be disturbed absent an abuse of discretion. State v.Jones, 90 Ohio St.3d 403, 414, 2000-Ohio-1874, citing State v.Bidinost, 71 Ohio St.3d 449, 453, 1994-Ohio-465. The term abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 31} As an initial matter, we note that appellant does not challenge Dr. Scala-Barnett's ability to testify as an expert in her field. That said, a review of the doctor's testimony reveals that the she never indicated that Hassani's hypothermia was the result of his being confined on an enclosed, unheated porch in subfreezing temperatures. The doctor simply stated that she could not rule out this scenario as being a possible cause of the hypothermia. Moreover, based upon our review of the relevant portions of the record of the case sub judice, we conclude that the deputy coroner's investigation and subsequent report and testimony complied with R.C. 313.17.
 {¶ 32} Dr. Scala-Barnett's testimony discloses that she investigated three conditions that might have led to Hassani's hypothermia. These were being kept in cold water in the bathtub, in the refrigerator, or in the unheated porch. R.C. 313.17 provides that the coroner's report and, necessarily, any testimony based upon that report, must be derived from "personal observation by the coroner or his deputy of the corpse, from statements of relatives or other persons having any knowledge of the facts, and from such other sources of information as are available, or from the autopsy." Therefore, the deputy coroner, as allowed by R.C.313.17, permissibly investigated the circumstances surrounding Hassani's death in order to gain information for her report and expert testimony. Consequently, the admission of testimony related to this investigation does not constitute an abuse of discretion. Appellant's first assignment of error is found not well-taken.
 {¶ 33} In her fifth assignment of error, appellant contends that she was denied due process of law as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the trial court failed to ask appellant, on the record, whether her failure to testify was the result of her own decision. Appellant acknowledges the fact that the Ohio Supreme Court has rejected this very argument in a number of cases. See, e.g., State v. Bey (1999), 85 Ohio St.3d 487,499 (A trial court does not have to inform a defendant of his right to testify on his own behalf). Therefore, because we are bound by the doctrine of stare decisis to follow existing precedent, appellant's fifth assignment of error is found not well-taken. See Williams v.Akron, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 34, O'Donnell, J., concurring.
 {¶ 34} In her second assignment of error, appellant asserts that the trial court erred in denying her Crim.R. 29 motion for acquittal. The motion was made at the close of the prosecution's case and was renewed at the close of all evidence. Appellant again contends that the deputy coroner's testimony concerning the cause, being placed in an unheated porch, of Hassani's hypothermia, was highly speculative. She further argues that the only evidence of child endangerment were two instances where Hassani was punished by being placed in cold water. Appellant maintains that in order to reach the conclusion that she endangered her child, the jury was required to impermissibly reach an inference based upon an inference.
 {¶ 35} We start with the proposition that "[circumstantial evidence and direct evidence inherently possess the same probative value [.]"State v. Jenks (1991), 61 Ohio St.3d 259, paragraph one of the syllabus. Furthermore, "[s]ince circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." Id. at 272. While inferences cannot be based on inferences, a number of conclusions can result from the same set of facts. State v. Lott (1990), 51 Ohio St.3d 160, 168, citing Hurt v.Charles J. Rogers Transp. Co. (1955), 164 Ohio St. 329, 331. Moreover, a series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusions in a case. Id.
 {¶ 36} In reviewing a record for sufficiency, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v.Virginia (1979), 443 U.S. 307, 319; Jenks, 61 Ohio St.3d at 273. Sufficiency is a test of adequacy. State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52.
 {¶ 37} As we found in determining appellant's first assignment of error, Dr. Scala-Barnett never opined that the cause of death, hypothermia, was the result of Hassani being confined to the apartment's porch for a period of time. Rather, her findings were based upon the fact that the child was subjected to the cold for a period of time. Moreover, there was sufficient evidence offered at trial to prove, beyond a reasonable doubt, that appellant was guilty of both murder and child endangering.
 {¶ 38} R.C. 2903.02(B) reads:
 {¶ 39} "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second and is not a violation of R.C. 2903.03 or 2903.04 of the Revised Code."
 {¶ 40} R.C. 2919.22, provides, in material part:
 {¶ 41} "(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:
 {¶ 42} "(1) * * *
 {¶ 43} "(2) * * *
 {¶ 44} "(3) Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child;"
 {¶ 45} The undisputed evidence offered at trial established that Hassani was a very active child who may have been diagnosed with either Attention Deficit Disorder or with Attention Deficit Hyperactivity Disorder. Testimony also showed that Hassani often vomited on or urinated and/or defecated in his clothing.
 {¶ 46} Christopher, Sr. testified that in the recent past appellant punished Hassani for vomiting on himself by putting him in a cold shower for a period of time. Both he and a friend, John Harris, testified that two days before Hassani died, Christopher, Sr., appellant, Christopher, Jr. and Hassani were supposed to go to the friend's apartment to watch movies. They were delayed five hours, however, because Hassani either vomited on himself or urinated and defecated in his clothes. Christopher, Sr. revealed that appellant punished Hassani by making him sit in a bathtub of cold water for one and one-half hours.
 {¶ 47} Harris testified that Hassani was acting strangely when the family arrived at his apartment. Hassani cried and fell down twice when he walked to Harris. The boy was shaking and cold to the touch. When Harris asked appellant why the child was in such a condition, appellant replied that she put him in a bathtub of cold water to punish him for urinating and defecating in his pants. According to Harris, when he pointed out that the child was very cold and shaking, appellant insisted that Hassani was "faking it."
 {¶ 48} Late in the evening of January 16, 2004 and during the early morning hours of January 17, 2004, appellant was the sole person charged with the care and discipline of her son. EMS personnel who answered her 911 call all noticed that Hassani was very cold to the touch. The medical staff at the hospital also remarked on the coldness of Hassani's body and, in fact, learned that his body temperature was 66 degrees Farenheit, a temperature far below the 95 degree temperature at which hypothermia begins. From all of the foregoing circumstantial evidence, the jury could permissibly infer that, beyond a reasonable doubt, appellant used "the cold" to discipline her three year old, that the method was excessive under the circumstances, and that it created a substantial risk of serious physical harm to Hassani, specifically, his death from hypothermia. Accordingly, after viewing the evidence in the light most favorable to the prosecution, we find sufficient evidence was offered upon which the jury could find that the essential elements of the charged offenses were proven beyond a reasonable doubt. Therefore, appellant's second assignment of error is found not well-taken.
 {¶ 49} In her fourth assignment of error, appellant contends that the trial court erred in sentencing her to nonminimum and consecutive sentences. Citing Blakely v. Washington (2004), 542 U.S. 296 and its progeny, appellant argues that in order to impose these sentences, Ohio's criminal statutory scheme allows a judge to use facts "that were neither part of the indictment nor admitted by h[er]." The state of Ohio concedes that, under the Ohio Supreme Court's decision in State v.Foster, 109 Ohio St.3d. 1, 2006-Ohio-856, this cause must be remanded for re-sentencing. We agree.
 {¶ 50} We first observe that appellant was tried and sentenced prior to the state supreme court's decision in Foster. At appellant's sentencing hearing, the parties agreed that, as the underlying offense for the charge of murder, appellant's third degree felony conviction for child endangering should be merged. The court then imposed an indefinite sentence of 15 years to life for the murder conviction and sentence of seven years for the third degree felony of child endangering[5]. These sentences were ordered to be served concurrently. The court imposed a three year sentence for the second degree[6] child endangering conviction, to be served consecutively to the sentence imposed on the murder conviction. In reaching its judgment on sentencing, the lower court relied on R.C. 2929.14(B), which governed the imposition of nonminimum sentences and R.C. 2929.14(E)(4) and 2929.41(A), which governed the imposition of consecutive sentences.
 {¶ 51} In Foster, the court held that portions of Ohio's statutory sentencing scheme were unconstitutional. Id. at ¶ 1, 3, and 5 of the syllabus. Among the statutes found unconstitutional were R.C.2929.14(B), R.C. 2929.14(E), and R.C. 2929.41(A). Id. at ¶ 1 and 3 of the syllabus. The Foster court severed these and other sections from the sentencing code and instructed that all cases pending on direct review in which the unconstitutional sentencing provisions were applied must be remanded. Id. at ¶ 104. Based on the holding in Foster, we are compelled to find appellant's fourth assignment of error well-taken.
 {¶ 52} In her sixth and final assignment of error, appellant claims that the trial court erred in ordering her to pay "costs of supervision, confinement, assigned counsel, and prosecution as assigned by law." Appellant asserts that there must be some evidence of a criminal defendant's present and future ability to pay such sanctions before they can be imposed.
 {¶ 53} Appellant did not preserve the issue of costs engendered at the trial court level at the time of sentencing by failing to move the court to waive costs. State v. Phillips, 6th Dist. No. F-05-032,2006-Ohio-4135, ¶ 14, citing State v. Threatt, 108 Ohio St.3d 277,2006-Ohio-905, ¶ 23. Moreover, even if appellant had not waived this issue, "costs of prosecution must be assessed against all defendants." Id. ¶ 15, citing Threatt, supra.
 {¶ 54} Next, we shall decide whether the court below erred in imposing fees under R.C. 2929.18(A)(4). R.C. 2929.19(B)(6) requires a trial court to consider an offender's present and future ability to pay before imposing any sanction under R.C. 2929.18. While a court is neither required to hold a hearing to make this determination nor to indicate in its judgment entry that it considered a criminal defendant's ability to pay, there must be some evidence in the record to show that the court did consider this question. Phillips at ¶ 18. An appellant court examines the totality of the record when deciding whether this requirement was satisfied. Id.
 {¶ 55} In the case before us, the trial court made the following finding in its judgment entry: "Defendant found to have, or reasonably expected to have, the means to pay all or part of the applicable costs of supervision, confinement, assigned counsel, and prosecution as authorized by law." However, when we examine the record of this cause there is no evidence to show that the trial judge actually considered the question of whether appellant had the present and future ability to pay any sanctions imposed pursuant to R.C. 2929.18(A)(4). Therefore, based upon a totality of the record, we must find that the trial court did not consider appellant's ability to pay and, therefore, erred in imposing these costs.
 {¶ 56} R.C. 2941.51(D) governs the right of a court to impose appointed counsel fees and costs on an offender. That person must, however, have, "or reasonably be expected to have, the means to meet some part of the cost of the services rendered to the person." R.C.2941.51(D); Phillips at ¶ 20. Therefore, this court previously held that in order to assess the costs of a criminal defendant's appointed counsel, a trial court must make a finding on the record that a criminal defendant has the ability to pay. Id. The court below made the requisite finding. Nevertheless, we further held that this finding must be supported by clear and convincing evidence in the record. State v.Knight, 6th Dist. No. S-05-007, 2006-Ohio-4807, ¶ 7. There is no evidence, clear and convincing or otherwise, in the record of this cause to support the finding that appellant has the ability to pay appointed counsel's fees. Accordingly, the trial court erred in finding that appellant had the ability to pay these fees and in ordering her to pay said fees.
 {¶ 57} For all of the foregoing reasons, appellant's sixth assignment of error is found well-taken, in part, and not well-taken, in part.
 {¶ 58} The judgment of the Lucas County Court of Common Pleas is affirmed, in part, and reversed in part, and this cause is remanded to that court for further proceedings consistent with this judgment. Appellant and appellee are each ordered to pay one-half of the cost of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED, IN PART, AND REVERSED, IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., William J. Skow, J., CONCUR.
[1] The indictment also charged appellant with one count of involuntary manslaughter, in violation of R.C. 2903.04(A), a felony of the first degree. Having found appellant guilty of murder, the jury returned a verdict of not guilty on the charge of involuntary manslaughter.
[2] This court viewed the entire videotape of the interview that took place at the Toledo Police Department.
[3] The testimony related to time frames varied. At the latest, appellant called Christopher, Sr. at 11:50 p.m. and asked him to come home to clean up the vomit.
[4] Dr. Scala-Barnett testified that hypothermia occurs when the body's temperature is 95 degrees Farenheit or lower. She further stated that at 85 degrees Farenheit respiration slows down and becomes shallow, a person may hallucinate and/or be disoriented, and the heart slows down and begins beating at an irregular rhythm.
[5] The minimum sentence for a third degree felony is one year. R.C.2929.14(A)(3).
[6] The minimum sentence for a second degree felony is two years. R.C.2929.14(A)(2)